DECISION
{¶ 1} Relator, Madelyn Peters, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her application for permanent total disability ("PTD") compensation and to enter an order finding that she is permanently and totally disabled.
{¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) Relator has filed an objection to the magistrate's decision.
{¶ 3} Relator argues that the magistrate did not address the issue of whether the commission erroneously relied upon inconsistent medical reports from Robin Stanko, M.D., and Gerald S. Steiman, M.D. Relator claims that the opinions of these two doctors differ as to whether she currently has reflex sympathetic dystrophy ("RSD") of her left foot, an allowed condition. We disagree for two reasons. First, neither Dr. Steiman nor Dr. Stanko rejected the allowed condition of RSD. They both recognized the condition and evaluated it. Dr. Stanko indicated that she found some residuals of RSD. Dr. Steiman found that there was an absence of requisite criteria for the diagnosis of RSD. However, Dr. Steiman's finding merely indicates that, as of the specific date of the examination, Dr. Steiman could not find any current objective or subjective symptoms of RSD.
{¶ 4} Second, any difference between them would have been significant only if the commission had relied upon both reports for the same conclusion. However, as the magistrate found, the commission's decision was based on two alternative analyses. Dr. Steiman's opinion was used to support the finding that relator was not permanently and totally disabled based upon the medical factors alone because her conditions would not prevent her from returning to her former positions of employment. Dr. Stanko's opinion was used to support the alternative finding that relator was not permanently and totally disabled based upon the medical and nonmedical factors because she was capable of sustaining remunerative employment. Thus, the commission's separate use of each of these reports to support alternative analyses raises no evidentiary problems. Because relator raises no other challenge as to Dr. Steiman's report, it could, in conjunction with the unchallenged reports of Drs. Lee Howard and Donald Brown, constitute some evidence to support the commission's independent, alternative basis that relator was not permanently and totally disabled because she could return to her former positions of employment.
{¶ 5} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objection, we overrule the objection and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objection overruled; writ denied.
Bryant and Sadler, JJ., concur.
 IN MANDAMUS
{¶ 6} In this original action, relator, Madelyn Peters, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
 Findings of Fact:
{¶ 7} 1. On February 12, 1993, relator sustained an industrial injury while employed as an "assembler" for respondent Sugar Creek Packing Company ("employer"), a state-fund employer. The industrial claim is allowed for: "sprain left foot, reflex sympathetic dystrophy left foot, depressive disorder," and is assigned claim number 93-43472.
{¶ 8} 2. On December 10, 2001, relator filed an application for PTD compensation. Under the "education" section of the application form, relator indicated that the tenth grade was the highest grade of school she had completed and this occurred in 1961. In response to further queries, relator indicated that she did not graduate from high school and she did not obtain a certificate for passing the General Educational Development ("GED") test.
{¶ 9} Under the "work history" section of the application, relator indicated that she worked in meat packing assembly on the date of her injury and that she had previously worked as a "certified aide" and "dietary aide" at a nursing home.
{¶ 10} 3. On March 15, 2002, relator was examined by psychologist Lee Howard, Ph.D. In his report, Dr. Howard indicates that he asked relator about her history of major life stressors and that relator reported the following factor: "1960s — Drops out of school after only completing the 10th grade and does not complete a GED."
{¶ 11} 4. Dr. Howard further reported:
{¶ 12} "Unfortunately, the claimant is not an optimally cooperative individual on her IQ testing today. She only responds 25 of 60 items and rejects 35 or over half of the test. This results in an invalid IQ score.
{¶ 13} "When the IQ test is adjusted due to the under performance tendency the research would indicate that her IQ score is going to be around 103. This is slightly above the normal range.
{¶ 14} "An IQ score of 103 is consistent with someone that perform[s] in the simple, moderate, and complex task range.
{¶ 15} "An IQ score of 103 is consistent with someone that can be trained to do multiple types of sedentary employment or can execute multiple types of sedentary employment.
{¶ 16} "An IQ score of 103 is suggestive of someone that can be retrained through at least a basic college two-year curriculum and/or technical school curriculum."
{¶ 17} 5. Dr. Howard's report concludes with several opinions:
{¶ 18} "Depressive disorder, not otherwise specified, is currently in remission.
{¶ 19} "* * *
{¶ 20} "The claimant's depressive disorder does not prevent her from returning to sustained remunerative employment. * * *
{¶ 21} "* * * [H]er anticipated IQ score of 103 is probably suggestive of a higher level of intellectual ability than previously anticipated and this is also suggestive of someone that can perform multiple types of work activities within today's work force at a sedentary level, through a complex level, and/or through a retraining venture at the basic college level or technical school level."
{¶ 22} 6. On March 22, 2002, relator was examined, at the employer's request, by Gerald S. Steiman, M.D. Dr. Steiman's report, dated March 26, 2002, states:
{¶ 23} "Due to the absence of requisite criteria for the diagnosis of Reflex Sympathetic Dystrophy, Ms. Peters' treatment should be considered inappropriate, unnecessary, and without benefit.
{¶ 24} "* * *
{¶ 25} "When considering the allowed conditions of `strain left foot; reflex sympathetic dystrophy, left foot', Ms. Peters' history, medical record review, physical examination and pain assessment provide no credible evidence which would preclude her from returning to her former position of employment without restriction or limitation. Similarly, Ms. Peters' history, medical record review, physical examination and pain assessment provide no evidence which would preclude her from performing sustained remunerative employment."
{¶ 26} 7. On April 5, 2002, a commission claims examiner issued a "statement of facts." Under "disability factors" the commission's statement of facts indicates a tenth grade education, and "No GED."
{¶ 27} 8. On April 18, 2002, relator was examined by commission specialist Robin G. Stanko, M.D., who specializes in physical medicine and rehabilitation. Dr. Stanko reported:
{¶ 28} "* * * By clinical exam today, the claimant does show some sensory alteration surrounding the left foot and significantly decreased sensation to light touch over the left lateral foot. There is some edema in the foot and she does show some residuals of a reflex sympathetic dystrophy. * * *
{¶ 29} "* * * [I]t is my opinion that this claimant has reached maximal medical improvement and that the condition has become permanent. Based on the AMA Guides to the Evaluation of Permanent Impairment, Fourth Edition, in my opinion, the claimant has a permanent impairment of 16% whole person * * *. I feel the claimant could perform activity at sedentary work levels, that is lifting up to 10 lb. with rare walking activity." (Emphasis sic.)
{¶ 30} 9. On April 18, 2002, relator was examined by commission specialist and psychiatrist Donald L. Brown, M.D. Dr. Brown reported: "She said she was an average student and had friends but quit in the 10th grade when she got pregnant. She never returned for a diploma or GED."
{¶ 31} 10. Dr. Brown further reported:
{¶ 32} "In my opinion, Mrs. Peters has reached MMI with respect to her previously allowed depressive disorder and it can be considered permanent. She does need to continue on medication with Dr. Stinson. Utilizing the 4th Edition of the AMA Guides to the Determination of Permanent Impairment, I would rate her as having a Class III level of impairment. This is a moderate level of impairment. Utilizing the percentages from the 2nd Edition in the 4th Edition, I would rate her impairment at 25-30%."
{¶ 33} 11. Dr. Brown also completed an occupational activity assessment form dated April 18, 2002. The form asks the examining psychiatrist the following two-part query:
{¶ 34} "Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this claimant meet the basic mental/behavioral demands required:
{¶ 35} "To return to any former position of employment?
{¶ 36} "To perform any sustained remunerative employment?" (Emphasis sic.)
{¶ 37} 12. Dr. Brown responded affirmatively to both queries.
{¶ 38} 13. The commission requested an employability assessment report from Jennifer J. Stoeckel, Ph.D., a vocational expert. The Stoeckel report, dated June 10, 2002, responds to the following query:
{¶ 39} "Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, immediately and/or following appropriate academic remediation."
{¶ 40} Indicating acceptance of Dr. Howard's report and responding to the above query, Dr. Stoeckel lists the following "employment options": "Appears to be a full range of work activity both with and without retraining. No restrictions on prior employment as an CNA [certified nurse's aide], dietary aide, nor assembler."
{¶ 41} Dr. Stoeckel listed the same "employment options" with respect to Dr. Brown's report.
{¶ 42} Indicating acceptance of Dr. Stanko's report and responding to the above query, Dr. Stoeckel listed the following "employment options": "Information aide, referral and information clerk, quality control inspector, dispatcher, reservation agent are possibilities."
{¶ 43} Indicating acceptance of Dr. Steiman's report and responding to the above query, Dr. Stoeckel listed the following "employment options": "Full range of work activity including employment as CNA, dietary aide, assembler and positions identified [with Dr. Stanko's report]."
{¶ 44} The Stoeckel report further states:
{¶ 45} "III EFFECTS OF OTHER EMPLOYABILITY FACTORS
{¶ 46} "* * * Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
{¶ 47} "Answer: Age: The claimant's age of 56 would not necessarily impede re-employment.
{¶ 48} "Education: The claimant has a history of 10th grade education, but obtained a GED. Her education is sufficient for most entry level positions.
{¶ 49} "Work History: Claimant has a sporadic work history. She worked briefly in assembly, briefly as a certified nurse['s] aide, and briefly as a dietary aide. She would have transferable skills in terms of relating to others, recording and some clerical capacities.
{¶ 50} "* * *
{¶ 51} "* * * Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
{¶ 52} "Answer: The claimant's history of obtaining a GED as well as some semi-skilled employment would indicate the ability to be remediated if necessary.
{¶ 53} "* * * Question: Are there significant issues regarding potential employ-ability limitations or strengths which you wish to call to the SHO's attention?
{¶ 54} "Answer: Strengths include this individual's age of 56, history of obtaining a GED and some semi-skilled employment. Negative vocational characteristics include departure from the work force nearly ten years ago, receipt of disability benefits that may act as a disincentive to return to work." (Emphasis sic.)
{¶ 55} 14. Dr. Stoeckel did not interview relator. Dr. Stoeckel lists eight documents that she reviewed in preparation of her report. Four of those documents indicate that relator never obtained a GED. Those documents are: (1) statement of facts; (2) PTD application; (3) Dr. Howard's report; and (4) Dr. Brown's report. The remaining four documents do not make reference to the GED.
{¶ 56} 15. Following an October 10, 2002 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order summarizes the reports of Drs. Stanko, Steiman, Brown and Howard, and states that those reports are found to be persuasive. The SHO's order further states:
{¶ 57} "The claimant was injured at work in 1993 when she tripped on a heavy cord on the floor and all her weight came down on her left foot. At the time, the claimant had worked at Sugar Creek Packing Company for approximately six months. Prior to that, the claimant had worked as a nurse['s] aide for approximately one [year] and as a dietary aide for approximately one year. She last worked on the date of injury, 04/06/1993. She is currently 56 years old (date of birth 07/21/1945), with a tenth grade education. There exists conflicting information regarding whether or not the claimant has a GED certificate, with her self report of not having one per her IC-2 Application filed 12/10/2001, but with an Employability Assessment Report from Dr. Stoeckel, dated 06/10/2002, and reporting that she has obtained a GED. The claimant submitted transcripts from her education, which purportedly demonstrated marginal mental aptitudes, but which failed to demonstrate such to the Staff Hearing Officer. For example, the transcripts did not demonstrate that the claimant had been `held back' in any grades. Instead, the transcripts only revealed that the claimant had withdrawn from school in the tenth grade. Likewise, the claimant presented evidence that the claimant's failure to have or obtain a driver's license was due to her low mental aptitude. However, the Staff Hearing Officer found no correlation in this case between the claimant's mental aptitude and her failure to ever obtain a driver's license. The evidence before the Staff Hearing Officer indicated only that the claimant had no desire nor need to obtain a driver's license.
{¶ 58} "An Employability Assessment to the Industrial Commission of Ohio was performed on 06/10/2002 by Jennifer J. Stoeckel, Ph.D. Based on separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed conditions, Dr. Stoeckel identified occupations which the claimant could reasonably be expected to perform, immediately and/or following appropriate academic remediation. Based on the reviewed medical report of Dr. Stanko, Dr. Stoeckel opined that the claimant would be immediately capable of the following employment options: Information Aide, Referral and Information Clerk, Quality Control Inspector, Dispatcher, Reservation Agent. Based on the medical report of Dr. Steiman, Dr. Stoeckel opined that the claimant would be immediately capable of the following options: Certified Nurse['s] Aide, Dietary Aide, Assembler, as well as those jobs previously identified under Dr. Stanko's restrictions. In consideration of the psycho-logical report from Dr. Brown, Dr. Stoeckel opined that the claimant would be capable of a full range of work activity both with and without retraining. In consideration of Dr. Brown's residual functional capacities, Dr. Stoeckel found no restrictions on prior employment as a Certified Nurse['s] Aide, Dietary Aide, nor Assembler. In consider-ation of the residual functional capacities as enumerated by psychologist Howard, Dr. Stoeckel likewise opined the same employment options as that enumerated by Dr. Brown, i.e. that the claimant can return to her former positions of employment as a Certified Nurse['s] Aide, Dietary Aide, Assembler, as well as a full range of work activity with or without retraining. Dr. Stoeckel opined that the claimant's age would `not necessarily impede reemployment.['] Dr. Stoeckel opines that the claimant's education is sufficient for most entry level positions. Dr. Stoeckel opined that the claimant's sporadic work history, working briefly in assembly, briefly as a certified nurse['s] aide, and briefly as a dietary aide would indicate transferable skills in terms of relating to others, recording and some clerical capacities. Dr. Stoeckel opined that the tempera-ments demonstrated in the claimant's work history are performing repetitive work, working with others, and varying tasks. Dr. Stoeckel opined that the claimant's history of obtaining a GED as well as performing some semi-skilled employment indicates the ability to be remediated if necessary.
{¶ 59} "The Staff Hearing Officer finds the report of Dr. Stoeckel persuasive to support the conclusion that the claimant is vocationally capable of performing numerous employment options in light of the residual functional capacities as enumerated by Drs. Stanko and Steiman on a physical basis and Drs. Brown and Howard on a psychological basis.
{¶ 60} "In summary and conclusion[,] the Staff Hearing Officer finds that the claimant is not permanently and totally disabled on a medical basis alone, in consideration of the reports of Drs. Steiman, Howard and Brown, all of whom indicate that the claimant's allowed respective physical/psychological conditions do not prevent her from returning to her former positions of employment in assembly, as a nurse['s] aide, and as a dietary aide or to other forms of sustained remunerative employment. Based on the report of [Dr.] Stanko, which opines that the claimant has residual functional capacities resultant from the allowed physical conditions in this claim, the Staff Hearing Officer finds the claimant is vocationally qualified for numerous other employment options, and therefore, is found not permanently and totally disabled when considering the claimant's vocational factors as well."
{¶ 61} 16. On January 24, 2003, relator, Madelyn Peters, filed the instant mandamus action.
 Conclusions of Law:
{¶ 62} Relator presents two issues: (1) whether the commission abused its discretion by relying upon allegedly inconsistent medical reports; and (2) whether the commission's non-medical analysis is flawed because Dr. Stoeckel determined that relator had earned a GED certificate.
{¶ 63} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
{¶ 64} The last paragraph of the commission's order indicates that the commission has set forth alternative bases for denial of the PTD application. It is not improper for the commission to state alternative grounds for supporting its order, but those grounds should not be merged together and should be explained separately so that a reviewing court can understand what has been done. State ex rel. Speelman v. Indus. Comm. (1992), 73 Ohio App.3d 757, 761.
{¶ 65} Ohio Adm. Code 4121-3-34 sets forth the commission's rules for the processing and adjudication of PTD applications. Ohio Adm. Code4121-3-34(D) sets forth the commission's guidelines for the adjudication for PTD applications. Pertinent here is Ohio Adm. Code 4121-3-34(D)(1)(c) and (2)(b).
{¶ 66} Ohio Adm. Code 4121-3-34(D)(1)(c) states:
{¶ 67} "If, after hearing, the adjudicator finds that the claimant is medically able to return to the former position of employment, the claimant shall be found not to be permanently and totally disabled."
{¶ 68} Ohio Adm. Code 4121-3-34(D)(2)(b) states:
{¶ 69} "If, after hearing, the adjudicator finds that the claimant, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors need be considered by the adjudicator.
{¶ 70} "The non-medical factors that are to be reviewed are the claimant's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the claimant may return to the job market by using past employment skills or those skills which may be reasonably developed.* * *"
{¶ 71} The last paragraph of the commission's order indicates that the commission set forth alternative bases for denial of the PTD application and those alternative bases are set forth at Ohio Adm. Code 4121-3-34(D)(1)(c) and (2)(b).
{¶ 72} As the commission's order indicates, the reports of Drs. Steiman, Howard and Brown support a finding that relator is not PTD "on a medical basis alone," that is, relator is medically able to return to the former position of employment. Relator does not directly challenge the reports of Drs. Steiman, Howard and Brown in this action as constituting some evidence upon which the commission can rely. Rather, relator alleges that the commission abused its discretion by relying upon the reports of Drs. Steiman and Stanko because those reports are allegedly inconsistent.
{¶ 73} However, Dr. Stanko's report was not relied upon to support the commission's determination that relator is not PTD "on a medical basis alone," i.e., based on Ohio Adm. Code 4121-3-34(D)(1)(c). Hence, even if it can be argued that the reports of Drs. Steiman and Stanko are inconsistent, that cannot flaw the order that states alternative bases for the decision.
{¶ 74} The commission does rely upon Dr. Stanko's report to support its alternative adjudication that relator is not PTD based upon the medical and non-medical factors pursuant to Ohio Adm. Code4121-3-34(D)(2)(b). Moreover, the commission's non-medical analysis places heavy reliance upon the report of its employability assessor, Dr. Stoeckel. The commission's reliance upon the report of Dr. Stoeckel to support its non-medical analysis seriously flaws the non-medical analysis.
{¶ 75} Dr. Stoeckel erred when she found from the documents she had reviewed that relator had obtained a GED certificate. As previously noted, Dr. Stoeckel did not interview relator. The documents reviewed consistently report that relator has not earned a GED. Dr. Stoeckel had no authority and no evidence to render a finding regarding the GED certificate that cannot be supported by the documents she reviewed. In short, Dr. Stoeckel's report cannot constitute some evidence that relator obtained a GED certificate.
{¶ 76} Under "effects of other employability factors," Dr. Stoeckel refers to the GED in response to questions number one, two and three. Dr. Stoeckel relies upon relator's tenth grade education and GED to conclude that her education is sufficient for most entry level positions. Dr. Stoeckel relies upon the GED as well as some semi-skilled employment to indicate that relator can be remediated if necessary. Dr. Stoeckel relies upon the "history of obtaining a GED" as an indication of a "strength" that relator has. It seems fair to conclude that Dr. Stoeckel placed much reliance upon the mistaken notation that relator had obtained a GED, and that reliance must have influenced Dr. Stoeckel's "employment options" analysis with respect to Dr. Stanko's report.
{¶ 77} While the commission's order notes "conflicting information" regarding the GED, it fails to recognize that the conflict must be viewed as a flaw in Dr. Stoeckel's report. The commission's order relies upon Dr. Stoeckel's report as if there were no factual error regarding the GED.
{¶ 78} Although the commission's reliance upon Dr. Stoeckel's report flaws its non-medical analysis and thus its adjudication under Ohio Adm. Code 4121-3-34(D)(2)(b), the commission's adjudication under Ohio Adm. Code 4121-3-34(D)(1)(c) is not an abuse of discretion.
{¶ 79} In short, while relator successfully argues here that the commission's non-medical analysis is flawed, she fails to successfully challenge the alternative basis for the commission's order. Because the commission's PTD determination is supported by the reports of Drs. Steiman, Howard and Brown, the writ of mandamus must be denied.
{¶ 80} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.